We'll begin with argument in United States v. Lowe. Good morning. May it please the Court. My name is Florian Midell. I represent the appellant, Kevin Lowe, in this case. Your Honors, let me say at the outset that I recognize that the Court can dispose of this case on procedural grounds. I know that Counsel below failed to preserve any of these issues and at least passively agreed to the conscious avoidance charge that we now take issue with. However, I urge you to consider the issues presented here because I think they're actually quite important. Let me start with the first issue. The conscious avoidance charge in a single objective conspiracy, at least under the facts as presented in this case, simply makes no logical sense. And I think we all agree that we want the law, especially as it's conveyed to jurors, to make sense and to be logical. This Court originally recognized in the Mancani case that it was illogical to permit a conscious avoidance instruction in a conspiracy case. Now, I know that the Court has since then backed away from those early views. And while it is now considered established to break the second element of conspiracy into two parts, one allowing conscious avoidance and one prohibiting conscious avoidance, I'm not sure that this precise question has ever been placed before the Court in this way, namely that the Mancani directive should continue to apply in a single objective conspiracy, or at least under the facts as were presented here. And the reason for that, Your Honors, is that in a case where the conspiracy has one sole objective, a person simply cannot willfully, intentionally join that conspiracy without knowing what the objective of that conspiracy is. They're intertwined. And so in that case, as here, the instruction simply makes no sense. A conspiracy, by definition, is a criminal agreement. Here, Dr. Lowe could not join the criminal agreement to unlawfully dispense oxycodone without knowing the purpose of the conspiracy was to dispense oxycodone unlawfully. Otherwise, he wasn't joining a conspiracy. He was joining an agreement to, what, practice medicine or dispense medications or write prescriptions, but he was not joining a criminal conspiracy. And that's why the Gonzales-Pujol case that I said in my briefs from the District Court in Kentucky is instructive. Now, I know that it's obviously not precedent. Isn't that based on how you define the objectives or the aims of the conspiracy? You say it's just one goal, one aim, sell oxycodone illegally, right? But there was a lot going on here that make up that one goal. There were a lot of steps, a lot of ways of accomplishing that goal. For example, the jury could conclude that he consciously avoided going to the doctor tournament clinic on Southern Boulevard. He was only there once, I think the testimony was. But he puts up cameras. He talks to the staff a lot. Why couldn't the jury conclude that he did that on purpose? He didn't want to be seen at that Southern Boulevard clinic. You say it's just one goal, but isn't it broken down into different parts to achieve the, you know, to achieve that goal of the conspiracy? Well, that may be, but if the jury is not permitted to consider conscious avoidance to determine whether he joined the conspiracy. That's true. And so. You agree with that. Right. It's just the aims and objectives of the conspiracy. Right. But what I'm saying, I guess, is that those are intertwined when there's only one goal. And you say, well, there may be different steps toward that goal, but it's still one goal. The goal is, as charged in the indictment, unlawfully dispensing oxycodone without. Couldn't you say that in any drug conspiracy? The goal is to sell a lot of drugs and make a lot of money. Well, not necessarily. It depends on how it's charged. You know, some drug conspiracies are charged that people are selling heroin, crack, different kinds of drugs, different amounts of drugs. If they're just selling heroin in one block in the Bronx and that's the only goal and there's 10 people involved in it, you can't charge conscious avoidance in that case. You can charge it in the substantive count. But not in a conspiracy. But not in a conspiracy if it's a single objective. Because, again, I don't think it's a mankind decision originally stated. It's not logical, right? How is it that you can, I mean, for a jury to try to figure out what it means that they have to find that a person intentionally joined the conspiracy, but the conspiracy doesn't exist except for the objective, but then that they can use conscious avoidance, that somebody consciously avoided learning what the objective was. It's simply illogical. I don't understand how one can reach that conclusion. Can you explain what the magic of two of the single conspiracy element of your argument is? What's the magic of this applying where there's a single conspiracy as opposed to a multiple-aim conspiracy? For example, if a person joined a band of smugglers, that would be joining a conspiracy to smuggle goods. Knowing that they're smugglers? Knowing that they're smugglers. All right. But that they then consciously avoided learning that they smuggled not only unlicensed cigarettes but also drugs or sex slaves or something. In that instance, there would be multiple objectives of the conspiracy to smuggle. But you're assuming that conscious avoidance doesn't apply to one but does apply to the other goal? No. What I'm saying is if a conspiracy only has one goal, as in the case here, unlawfully dispensing oxycodone, then that goal is what makes the conspiracy. There is no conspiracy without that goal. There is no other hat to hang on. How do you join a criminal agreement? How do you agree with somebody to commit a crime without knowing what the crime is? Are there any decisions that support your view? I know Moncani is probably not good law anymore. Are there any cases that say if it's just one type of drug in one particular area of the Bronx, you can never charge conscious avoidance for the aims and goals of the conspiracy? Is there any case that says this? Unfortunately, the only case I have to hang my hat on here is this district court decision from Kentucky. It's outside of my briefs, which addresses this very, very precise issue and reaches the same conclusion, which is when you have one specific goal of a conspiracy, you can't join that conspiracy without knowing what it is. And so you can't parse that element into two. In this case, the district judge also charged that you may not rely on willful blindness if he actually believed that the fact did not exist. So doesn't that mean here that it was harmless necessarily? Because doesn't that mean that if the jury found that it was legitimate dispensing of oxycodone, they couldn't convict? True. They couldn't have. But if they found it to be illegitimate dispensing, they still had to determine whether he joined the conspiracy. And, you know, this sort of takes me to the – I know I'll be close to my time, but this takes me to the second issue, which is that when the jury – you know, after deliberating for two whole days – and the government has described this case as overwhelming evidence, but in fact the jury struggled with this case for quite some time. And when they finally, after two days of deliberations, sent out a note, they asked specifically about the conspiracy charge and how conscience avoidance played into that. And the judge gave what I believe is an incorrect answer, which is that she said that conscience avoidance went to the element of knowing association. And knowing association alone, first of all, is not the correct standard for conspiracy. It's also willful participation because knowing association is easily confused with mere association, which is, of course, not permissible. Did she also say, but go back to page 18 of my original charge, and that's a more complete statement of that charge, so it's important for you to do that? She absolutely did, but I think that the jury had that charge for two full days. They, I'm sure, looked at it carefully. How long was the trial? How many weeks was the trial? The trial was, I think, a week and a half or so. The jury had that charge. After two days, they ask a clarifying question. She answers that question with one word. They ask, is knowing association, is what we're supposed to find, whether Dr. Lowe knowingly associated with the conspiracy? She says, yes. And then she says, but go back to the, we'll go back to instructions. Well, that, I think any person, I think it's reasonable to assume that when a jury gets from a court a one-word answer to their question, they're not then going to go back to the charge and say, well, actually it says something different here than what she said, so we should figure out what that means. That's just unrealistic. So, Your Honor. So what do we tell the courts in these circumstances? First, with respect to what you just talked about, what do they have to say? Go back and recharge the jury and give a more fulsome instruction? In terms of the question by the jury? Yeah. Well, I think that the judge in this case had two choices. One, she could simply say to the jury, I'm not going to elaborate. There's nothing more that I can tell you than what is already in the charge. Or, B, she could have said, she could have given the correct answer or a more full explanation of what the jury wanted to know, but she sort of chose a middle path, which was to give a brief one-word. Before she said that, though, she talked about all the cases about this stuff, and then she said, because of that, I just can't extemporize and chat with you about what it all means. All I can really do is refer you back to the charge. I know, but what's ironic about that is she said that, but then actually that's not what she did. She then went on to actually answer the question and said, the short answer to your question is yes, but you should go back to the jury charge. So I think that was the wrong path that she took. I see that I'm out of time, so thank you. But you've reserved some time for rebuttal, Mr. Is it Midell or? Midell. Midell, thank you. Mr. Diskant. Thank you. Good morning, Your Honors. Edward Diskant for the government. I also represented the government with my colleague, Ms. Martins, at trial below. Let me start by saying that notwithstanding the way this case has been presented on appeal, this was actually not a conscious avoidance trial. The government presented very substantial evidence of direct knowledge, including four cooperating witnesses, three of whom testified to criminal understandings they had with the defendant. The government offered text messages in which the defendant was put on notice about specific crimes occurring at his clinic. It offered video surveillance the defendant was accessing at his home computer in which he could see criminal groups gathering at his clinic. Now, with that said, the defendant did put his knowledge of a specific fact at issue, that is, his knowledge that these bulk prescriptions that were being generated in return for cash payments were medically unnecessary. And so consistent with the law of this Court, the government was entitled to an instruction on conscious avoidance because the defendant had put his knowledge at issue, and there was a reasonable factual predicate for a jury to find that the defendant had deliberately closed his eyes to that fact. That was why the instruction which the appellant concedes was a correct instruction of the law, was properly given. It's why there was no objection below. It's why there couldn't have been no objection below. It was a correct instruction. Sotomayor, is my recollection of the record correct that the appellant not only didn't object, but essentially made this as a joint request in the request to charge? That's absolutely right, Your Honor. And for just that reason, there is some reason to believe under the invited-error doctrine that there is total waiver of any such claim to error on appeal. The instruction was properly given. There was a factual predicate for it. And the jury's verdict speaks for itself. The jury did ask about conscious avoidance, right? We'd asked about a number of things, Your Honor. And actually, here again, the facts of what happened are important because the jury gets this case late in the day on Wednesday. They deliberate for about an hour on Wednesday. They come back on Thursday. They deliberate all day. No substantive notes at all. I think they asked for an easel at one point, but otherwise no questions. They then take three days off because the court doesn't sit that Friday. They come back on Monday morning. First thing on Monday morning, they send out a note that has a number of very broad questions. What do we need to find? What is conscious avoidance? What does mere association mean? What does reasonable doubt mean? So, yes, among the things the jury asked about was conscious avoidance, but it was certainly not the only issue that the jury asked for clarification about. And what does the district court do? The district court tells the jury very clearly, I cannot simply chat with you about what these instructions mean. I cannot extemporaneously talk with you about these. Instead, she points the jury very carefully back to the original instruction, an instruction which was entirely correct. There's no question about that on appeal. And point by point tries to direct the jury back to that instruction. The jury has copies of the written instruction before it. The jury has them in the jury room so that they can go back. These page numbers have meaning to the jury. I ask you about her specific response to conscious avoidance. And she says there are two elements. One, did a conspiracy exist? And two, did Dr. Lowe knowingly associate himself with the conspiracy? As to the second one, that's where conscious avoidance comes in, and that's on page 18. But she was wrong about that, right? Well, it was less than perfectly precise. It is certainly true that between the two elements, conscious avoidance only comes in on the second one. So in that respect, she was --- The second element is not knowingly associate himself with the conspiracy. The second element in the cases is the goals and objectives of the conspiracy. So that was imperfectly stated, at least, right? That's absolutely right, Your Honor. I will note, though, that she goes on in the very next paragraph. It's actually the final thing she says to the jury before they go back to more correctly and fully state the second element, which is whether the defendant knowingly associated himself with and became a member of the conspiracy. She also, at another point in the supplemental instruction, specifically reads the second element of the instruction, as in this is the appendix at 1556. You know, did Dr. Lowe knowingly become a member of the conspiracy? That is, did he knowingly associate himself with the conspiracy and participate in the conspiracy to distribute narcotics? So at two separate points during that very brief, quote, unquote, supplemental instruction, Judge Schofield did correctly state the elements, the second element. And more importantly, the entire purpose of her response was to direct the jury back to the written instruction, which, of course, each of them had in front of them, which fully and correctly stated the second element and fully and correctly stated how conscious avoidance could be applied to a portion of the second element. So for all those reasons – I was going to ask, Judge Thapar, in the Kentucky case, you have in your footnote you just basically say it's not controlling and may be wrong. Do you have any other response to Judge Thapar's decision, which reflects the same intuition, I think, as the defendant is arguing here? Yeah. So a couple of things. I mean, the first issue, and we note this in our brief, is it's not clear to us that the judge in Kentucky was even correctly applying Sixth Circuit law, and actually there appears to be diverging opinions within that circuit on this issue. But I think the second issue, and in terms of correctly applying Second Circuit law, goes back to Judge Droney's point on the issue of how there can be multiple issues even with respect to a single-object conspiracy. Here the government did prove that the defendant knowingly, intentionally, willfully joined in and indeed orchestrated a conspiracy to set up a high-volume oxycodone clinic. He orchestrated a conspiracy to accept only cash payments for that oxycodone. He orchestrated a conspiracy to hire doctors willing to write those prescriptions in high volume. He orchestrated a conspiracy to accept groups of patients at a time, many coming from out of State, all facts from which one could infer the final fact that the defendant put in dispute, which is the issue of whether or not he knew those prescriptions were medically unnecessary. But I wonder if the intuition of Judge Tappar, I wonder if it's not accidental that that opinion was written also in an oxycodone case for the following reason. In a typical drug-controlled substance case, someone picks up a suitcase. They don't know if it's heroin or cocaine. Either one is illegal. Whereas in this case, if they don't know the goal is illegitimate distribution of oxycodone, then it's totally legitimate. So the line between knowing and not knowing the illegal purpose is actually the line of completely legitimate conduct. So I wonder if that's why the intuition is a little different in this than your typical drug case where you know what's going on is illegal by definition. Could that be a distinction that's relevant here? I think it's certainly true that in that respect oxycodone is a little different than, say, heroin or cocaine. But with respect to the specific issue you're highlighting, I think Reyes, the case we rely on quite heavily in our brief, is directly on point. Because there you have a defendant who is engaged in buying and selling, quote, unquote, secondhand airbags. And much as with oxycodone, if these are legitimately purchased secondhand airbags, there is nothing inherently unlawful about joining in a conspiracy to buy and sell secondhand airbags. There as here, however, there were lots of facts from which the government could either argue the defendant had actual knowledge because here are all the circumstances surrounding these airbags that would have led him to know that they were, in fact, stolen, or in light of the defendant's denial of that knowledge, get a conscious avoidance instruction. Here as there, there are any number of red flags from which the defendant could have drawn the inference, the knowledge, that is, that the prescriptions being written were medically unnecessary, which would have converted his conspiracy to distribute high volumes of oxycodone in return for cash from a potentially lawful into a clearly criminal conspiracy. I see my time is about to expire. Unless the panel has questions, I'm otherwise happy to rest for the week. Thank you. Thank you, Mr. Discat. Mr. Medell, you have two minutes for rebuttal. Thank you, Your Honor. Three points. The government states that the case was overwhelming in proof of actual knowledge that was presented as such, and that is true, although the fact is that while there was plenty of evidence that a conspiracy existed, the evidence was far less overwhelming that Dr. Lowe intentionally participated in that conspiracy. Mr. Discat mentioned three cooperators. No cooperator testified that they had had any specific explicit conversation with Dr. Lowe about this conspiracy. The crew chiefs who were the ones who really ran this drug business in the clinic did not know Dr. Lowe and, in fact, took steps to try to keep information from him. The one witness, Dr. Tertiman, who testified the best he could say was that he had an unspoken understanding with Dr. Lowe but had to concede that Dr. Lowe never threatened to fire him, never reprimanded him for not writing enough prescriptions, never made the number of prescriptions he wrote a condition of his employment. So it's not surprising that the jury struggled with this issue, and after two days of deliberations, what they focused on was the element of the knowing association piece and also the conscious avoidance piece, and that's why this issue is so front and center. So here's one of the problems that I have, but it's off what you have talked about except what you acknowledged at the front end. What do we say to the district court so that they feel some safety that if they give a charge that is requested by the defendant, it's not going to come back and bite them when we all decide or we three or two of the three of us decide that that charge should not have been given? I mean, how do we articulate that so that the jurisprudence of this circuit, at least, isn't something very discomforting to the district court? The way that this came about was a month before the trial started, the government submitted what were called joint requests to charge. I think that this lawyer, as I mentioned in my briefs, who was conducting his first federal trial, had probably never seen a conscious avoidance charge before. Certainly no lawyer would affirmatively request a conscious avoidance. No defense lawyer would affirmatively request a conscious avoidance charge. So this was really more, and I think under the circumstances here, especially because that proposed set of instructions included draft charges. It wasn't clear whether they were all going to be charged. This was really an issue of failing to object. But I think a court has a responsibility, a district court has a responsibility, to determine whether a charge fits the facts of the case, whether it's requested or not. And so under the circumstances here, again, I think that the conscious avoidance charge on this single object of conspiracy didn't make a whole lot of sense. Okay. And maybe there's a way to address that in the future. Right. Thank you, Your Honor. Okay. Thank you both. We appreciate your arguments. We'll reserve decision.